# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

EDNA RILEY,

      **Plaintiff,**

vs.                                                         No. 01cv0548 LH/JHG

JOANNE B. BARNHART,[1]
COMMISSIONER OF SOCIAL SECURITY,

      **Defendant.**

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION

This matter is before the Court on Plaintiff's (Riley's) Motion to Reverse Partially Favorable Administrative Decision, filed January 2, 2002. The Commissioner of Social Security issued a final decision partially favorable but denying Riley's application for disability insurance benefits and supplemental security income prior to July 14, 1999. The United States Magistrate Judge, having considered the arguments, pleadings, administrative record, relevant law, and being otherwise fully informed, finds the motion to reverse is well taken and recommends that it be GRANTED.

Riley, now sixty-six years old, filed her application for disability insurance benefits and supplemental security income on February 14, 1998 and February 2, 1995, respectively, alleging disability since December 18, 1994, due to severe pain in both hips and both legs. She has a high school education with past relevant work as a bookkeeper, counter clerk and dispatcher. Riley's

---

[1] On November 9, 2001, JoAnne B. Barnhart was sworn in as Commissioner of the Social Security Administration. Thus, she is substituted as Defendant in this action.

application was denied at the initial and reconsideration levels. On July 15, 1996, the Commissioner's Administrative Law Judge (ALJ) issued an unfavorable decision and denied Riley benefits. Plaintiff appealed the unfavorable decision to the Appeals Council. On December 11, 1998, the Appeals Council vacated the ALJ's unfavorable decision and remanded the case to the ALJ. Specifically, the Appeals Council directed the ALJ (1) to reconsider Riley's maximum residual functional capacity (RFC) and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations; (2) to attempt to obtain the medical evidence identified in the list of exhibits as Exhibits 25, 26, 27, and 28; and (3) to obtain evidence from a vocational expert (VE) as to whether Riley's past relevant work (the complete job duties) corresponded to any job title in the Dictionary of Occupational Titles and, if so, whether the exertional requirements as the job is usually performed were within Riley's functional limitations. Tr. 192. If there was no past relevant work within Riley's functional limitations, the ALJ was to inquire of the VE whether Riley's acquired job skills that could be readily transferred to a significant number of other jobs in the economy within Riley's functional limitations. *Id.*

The ALJ held a supplemental hearing on September 20, 1999. On November 16, 1999, the Commissioner's Administrative Law Judge (ALJ) found Riley was disabled and granted disability insurance benefits. However, the ALJ found Riley's disability commenced on July 14, 1999. The ALJ found that prior to July 14, 1999, Riley could return to her past relevant work as a bookkeeper. Riley appealed the partially favorable decision to the Appeals Council. The Appeals Council denied Riley's request for review of the ALJ's partially favorable decision. Hence, the decision of the ALJ became the final decision of the Commissioner for judicial review

purposes. Riley seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. § 405(g).

The only issue before the Court is whether substantial evidence supports the ALJ's finding that Riley was able to perform her past relevant work before the established disability onset date of July 14, 1999, and therefore not disabled prior to that date.

The standard of review in this Social Security appeal is whether the Commissioner's final decision is supported by substantial evidence and whether he applied correct legal standards. *Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992). Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir. 1994). "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Moreover, "all of the ALJ's required findings must be supported by substantial evidence," *Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence of record must be considered in making those findings, *see Barker v. Bowen*, 886 F.2d 289, 291 (10th Cir. 1989). "[I]n addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). Therefore, while the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from

the ALJ's findings, in order to determine if the substantiality test has been met. *See Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

In order to qualify for disability insurance benefits or supplemental security income, a claimant must establish a severe physical or mental impairment expected to result in death or last for a continuous period of twelve months which prevents the claimant from engaging in substantial gainful activity. *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing 42 U.S.C. §423(d)(1)(A)). The regulations of the Social Security Administration require the Commissioner to evaluate five factors in a specific sequence in analyzing disability applications. 20 C.F.R. § 404.1520 (a-f). The sequential evaluation process ends if, at any step, the Commissioner finds the claimant is not disabled. *Thompson v. Sullivan*, 987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show she is not engaged in substantial gainful employment, she has an impairment or combination of impairments severe enough to limit her ability to do basic work activities, and her impairment meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or she is unable to perform work she had done in the past. 20 C.F.R. §§ 404.1520 and 416.920. At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering her residual functional capacity, age, education, and prior work experience. *Id.*

In support of her motion to reverse, Riley makes the following arguments: (1) the ALJ failed to consider all of the medical evidence and failed to comment on her treating physician's opinions of disability; (2) the ALJ's credibility determination is flawed and not supported by substantial evidence; and (3) the ALJ failed to discuss the combined effects of her impairments.

Riley contends the ALJ failed to consider all of the medical evidence, in particular, her treating physician's opinion of disability and the orthopedic surgeon's opinion of disability. Although the ALJ need not discuss all of the evidence in the record, he may not ignore evidence that does not support his decision, especially when that evidence is "significantly probative." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). Additionally, a treating physician may offer an opinion about a claimant's condition and about the nature and severity of any impairments. *Castellano v. Secretary of Health and Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994). A treating physician's opinion that his patient is disabled is not dispositive, as final responsibility for determining disability rests with the Commissioner. *Id.* However, the regulations provide that the agency generally will give more weight to medical opinions from treating sources than those from non-treating sources and that the agency will give controlling weight to the medical opinion of a treating source if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(d)(2). Unless good cause is shown to the contrary, the Secretary must give substantial weight to the testimony of the claimant's treating physician. If the opinion of the claimant's physician is to be disregarded, specific legitimate reasons for this action must be set forth. *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984). Additionally, the opinions of specialists related to their area of specialty are entitled to more weight than that of a physician who is not a specialist in the area involved. See 20 C.F.R. § 404.1527(d)(5). Finally, an ALJ may not substitute his own opinion for medical opinion. *See Sisco v. United States Dep't of Health & Human Services*, 10 F.3d 739, 744 (10th Cir. 1993).

Dr. Houle, Riley's treating physician since 1989, provided the following information and opinions:

(1) Letter dated January 16, 1996– Dr. Houle reported Riley had been his patient since 1989, she had undergone a mitral valve replacement in 1991 and developed severe leg pain after the surgery. Riley had a substantial evaluation for the severe pain at Lovelace and UNM. Evaluations for spinal stenosis, vascular claudication, and arthritis were done. Multiple medications had been tried without very much success. Dr. Houle and the Rheumatology Division at UNM opined she had significant degenerative joint disease with chronic pain. Her therapy for the past few years was limited to pain control with Roxicet, four times a day on a regular basis. Dr. Houle opined Riley's pain was chronic and debilitating. Dr. Houle also made it clear that he could be contacted if more information was needed. Tr. 174.

2) Letter dated May 16, 1997– Dr. Houle again reported Riley has been his patient since 1989 and had undergone a mitral valve replacement in 1991, developing severe leg pain after the surgery which was initially at night and then progressed where it was present throughout the day, as well as at night. Dr. Houle diagnosed Riley's condition as "combination of severe restless leg syndrome and degenerative arthritis involving the knees and patella." Dr. Houle explained that due to her chronic anticoagulation treatment and presence of metal in both her jaw and heart, evaluations with MRIs were not feasible and treatment with medications other than narcotics were not feasible. Dr. Houle reported Riley had suffered severe pain since 1991 and had gotten worse. Because Riley had been evaluated through both the Rheumatology departments at Lovelace and UNM with no additional treatments felt to be helpful, Dr. Houle opined Riley's "length of disability would start in 1991 and extend indefinitely." Finally, Dr. Houle outlined Riley's

6

treatment which entailed maintaining her on Percocet one tablet four times a day for partial control of her pain. Dr. Houle opined the treatment allowed Riley to maintain a low level of functioning, but she was still substantially affected by pain, as her control was only partial. Tr. 201.

3) Letter dated July 17, 1998– Dr. Houle presented essentially the same information as those in his previous two letters. He diagnosed Riley as having severe ongoing restless leg syndrome and degenerative arthritis with chronic pain. Dr. Houle reported he had tried different medications and noted she was currently on methadone, which had helped her pain, although not eradicated it. Dr. Houle also reported Riley was in constant moderate pain because her pain control was only partial. Finally, Dr. Houle opined Riley "[was] totally disabled because she [was] constantly in pain and unable to attend her focus on anything on a consistent basis." Tr. 211-212.

4) Dr. Houle's medical notes pertinent to Riley's complaints of leg pain: July 23, 1991– Riley came in for a valve replacement follow-up at that time she complained of not sleeping well because her leg "ached" all the time and couldn't keep them still at night. Dr. Houle prescribed Klonopin. Riley was already on Lanoxin (heart medication) and coumadin (anticoagulant). July 29, 1991– Riley reported medication is not helping her leg pain. Dr. Houle prescribed Ativan (tranquilizer), Halcion (sleeping pill) at bedtime and Darvocet, a pain medication. August 21, 1991– Riley complained the Halcion was not helping her. Dr. Houle prescribed Elavil (antidepressants). October 7, 1991– Riley came in for follow-up of her "restless legs" problem. Riley reported she wakes up at midnight with leg cramps and can't go back to sleep. Dr. Houle again diagnosed Riley with restless leg syndrome and prescribed more Darvocet. September 2,

1992– Rile complained of her legs still cramping and having swollen ankles and an inability to sleep for the past two months. Dr. Houle prescribed Percocet, four tablets daily. Tr. 204-205.

On February 8, 1993, Dr. Gatter, a rheumatologist, evaluated Riley for complaints of pain in both lower extremities. Tr. 135-137. Dr. Houle had referred Riley to Dr. Gatter. At that time, Riley reported her pain bothered her at night and when sitting but not when walking or during other working activities. Riley reported she obtained fair relief from the pain with Percocet four times daily. The examination revealed some "non-pitting" edema of the ankles, more marked on the left than the right. There was no warmth or tenderness. Tr. 136. Dr. Gatter assessed Riley with myofascial pain versus fibromyalgia in the areas of the neck and trunk. The ankle pain he assessed as "undefined." Dr. Gatter referred Riley to physical therapy and prescribed a muscle relaxant. Tr. 137.

On March 14, 1994, Dr. Beck, a cardiologist with Southwest Cardiology Associates, examined Riley. Dr. Beck noted Riley had "a few millimeters of pitting edema." During that visit, Riley raised her concerns about her leg pains. Dr. Beck referred her to a neurologist. Tr. 170. On May 5, 1995, Dr. Benge, a cardiologist with Southwest Cardiology Associates, evaluated Riley for left sided chest pain. Dr. Benge noted "chronic leg pain, etiology uncertain" as one of Riley's problems. He noted no edema of the extremities at that time. Tr. 164-165. On July 26, 1995, Dr. Lueker, also a cardiologist with the same group, submitted a letter stating Riley had "evidence of significant rheumatic heart disease" and "significant problems with congestive failure which have improved on her current medical regimen." Tr. 162. On August 8, 1995, Dr. Lueker submitted another letter and opined that "at this point I do not believe that she has a major impairment that would interfere with ordinary physical activity or job, occupation, recreation,

8

etc." Tr. 161. Dr. Lueker further stated "this would depend entirely upon the occupational pursuit which she is embarking on . . . depends upon the level of involvement, the hours, etc. and a specific answer to this question cannot be stated without some additional information." *Id.*

On June 21, 1994, Dr. Hurley evaluated Riley. Riley complained of "aching in both knees" and aching in her ankles. Tr. 132. Dr. Hurley noted that x-rays had been taken and had been interpreted as being normal. The examination revealed Riley's knees were palpably warm, the right knee was warmer than the left knee. *Id.* The right knee was moderately swollen. *Id.* Dr. Hurley also noted Riley had "very poor circulation" in her feet. *Id.* Dr. Hurley was "unable to appreciate an anterior tibial pulse or a posterior tibial pulse." *Id.* Dr. Hurley diagnosed Riley with possible chronic synovitis and definite peripheral vascular disease. *Id.* Dr. Hurley treated Riley with intra-articular injection to both knees consisting of Kenalog, Decadron and Marcaine. *Id.* Dr. Hurley also prescribed Trental (assists circulation) and calcium. On July 5, 1994, Dr. Hurley reevaluated Riley. Riley reported she was pleased with the results and no longer had knee pain. Tr. 132. On July 1, 1994, Riley returned with complaints of pain to both legs. Tr. 131. Dr. Hurley described the pain as "rather nondescript" and noted "this is a difficult symptom complex to figure out." Dr. Hurley instructed Riley to continue with the medications. On August 9, 1994, Riley saw Dr. Hurley with complaints of pain to both knees and ankles. Tr. 131. Dr. Hurley described Riley's pain as " a rather nondescript aching in her knees and her ankles." *Id.* Dr. Hurley noted "some temporary relief from the steroid injections . . . but other than this nothing seems to help." *Id.* Dr. Hurley gave Riley another treatment of intra-articular injections with Kenalog, Decardon, and Marcaine. *Id.*

9

The medical records from UNM Medical Center indicate as follows: October 24, 1994–Riley complained of chronic knee and ankle pain in both legs. Tr. 159. Dr. Rivero evaluated her and noted Riley had excellent passive range of motion of the knees and ankles, with no tenderness of the left knee or ankles. Riley had some lateral joint line pain to palpation in her right knee. Dr. Rivero ordered lab work and x-rays to rule out mild degenerative arthritis versus rheumatoid arthritis. Tr. 157. The x-rays of the right knee were normal. Tr. 156. On November 8, 1994, Dr. Rivero evaluated Riley and noted "[C]omplains of bilateral ankle pain and some right knee pain at rest. She states that this pain is not worsened with activity. She denies any swelling of her ankle or right knee." Tr. 153. The physical examination did not reveal any abnormalities. The x-ray of the right knee showed "very mild degenerative joint disease." *Id.* Dr. Rivero referred Riley to Vascular Surgery to evaluate possible vascular compromise to her lower extremities. *Id.*

On November 22, 1994, Riley was seen at Vascular Surgery. The physician's notes indicate the orthopedic clinic had referred Riley for knee and ankle pain of four years duration which was worse at rest. Tr. 150. The physical examination revealed edema of the left ankle with mild erythema and tenderness to the left dorsal surface. *Id.* The physician assessed Riley as having "probable pain related to DJD (degenerative joint disease), not likely to be vascular." *Id.* The physician referred Riley to the rheumatologist.

On December 6, 1994, Riley returned to UNM Medical Center with complaints of pain in both legs. Tr. 146. At this time, Riley reported the pain was "achy pain" which worsened with inactivity and interfered with her ability to sleep. Riley denied weakness or numbness. The physician ordered lab work and x-rays to rule out neuropathy. *Id.* On December 20, 1994, a neurologist evaluated Riley to rule out peripheral neuropathy. Tr. 139. Riley reported Percocet

did not relieve the pain. Riley also complained about her inability to sleep. The neurologist noted Riley's EMG and NCV studies were all normal. The neurologist also noted he could not demonstrate neuropathy and could not explain her pain but opined her "sleep loss" probably aggravated it. He recommended treatment with medications. *Id.* On January 3, 1995, Riley was seen at UNM Medical Center. Tr. 138. The physician noted the neurologist's findings. Riley was still complaining of pain in her ankles and knees with swelling. The physician referred her to the pain clinic for a consultation. *Id.*

     Riley contends the ALJ failed to consider all of the medical evidence and failed to comment on her treating physician's opinions of disability. In his November 16, 1999 Decision, the ALJ specifically found Dr. Houle's comments in his January 1996 letter of disability were consistent with Dr. Toner's diagnosis made on July 16, 1999. Tr 16. The ALJ found "Dr. Toner diagnosed arthritic process, with effusion to the right knee and decreased range of motion of both knees and to the entire spine. This diagnosis is generally consistent with the comments made by Dr. Houle in January 1996." *Id.* Dr. Toner is board certified in emergency medicine but lists his specialty as occupational medicine. Dr. Toner reviewed Riley's medical records, performed an examination and concluded Riley was disabled. Dr. Toner did not order any additional laboratory work or x-rays. Tr. 224-226. However, the ALJ disregarded Dr. Houle's 1996 letter of disability stating it "did not include clinical or laboratory findings or specific statements about what Claimant could still do, based upon those findings . . . ." Tr. 19. The ALJ never requested anything further from Dr. Houle even though Dr. Houle's letter specifically stated "If there is any other information needed, please contact me." Tr. 216.

11

Additionally, the medical records reflect that Riley's problems were documented since 1993. On February 8, 1993, Dr. Gatter's examination revealed some "non-pitting" edema of the ankles, more marked on the left than the right. Dr. Gatter assessed Riley with myofascial pain versus fibromyalgia in the areas of the neck and trunk. The ankle pain he assessed as "undefined." On March 14, 1994, Dr. Beck's examination revealed Riley had pitting edema of her extremities. On June 21, 1994, Dr. Hurley's examination revealed Riley's knees were palpably warm, the right knee was warmer than the left knee. The right knee was moderately swollen. Dr. Hurley also noted Riley had "very poor circulation" in her feet. Dr. Hurley was "unable to appreciate an anterior tibial pulse or a posterior tibial pulse." Dr. Hurley diagnosed Riley with possible chronic synovitis and definite peripheral vascular disease. On November 22, 1994, the physician at the Vascular Surgery clinic examined Riley and noted she had edema of the left ankle with mild erythema and tenderness to the left dorsal surface. *Id*. The physician assessed Riley as having probable pain related to degenerative joint disease. Finally, the record is replete with evidence that Riley was on pain medication that she took regularly yet only attained partial relief.

The ALJ relied on Dr. Lueker's August 8, 1995 letter to find that Riley was not disabled when she applied for disability benefits in February 1995. However, the ALJ failed to note that Dr. Lueker did not opine that Riley was not disabled. In fact, Dr. Lueker was very clear that he could not answer the question of whether Riley was disabled or not and stated "this would depend entirely upon the occupational pursuit which she is embarking on . . . depends upon the level of involvement, the hours, etc. and a specific answer to this question cannot be stated without some additional information." Tr. 161. Moreover, as a cardiologist, Dr. Lueker was concerned with Riley's heart condition and did not mention her leg or ankle pain.

The ALJ also misconstrued Riley's Disability Report. Under "social contacts" Riley indicated "I visit with my mother during the day– we watch TV and work jigsaw puzzles about 6 hrs per day." Tr. 114. Above this category, Riley indicated she had no recreational activities "except reading when I can sit down long enough to read." *Id.* However, the ALJ found that "[w]hile Claimant was telling her doctors she could not sit for long periods of time, she was reporting to the Administration that she was working on jigsaw puzzles about six hours per day." Tr. 18. Riley's statement cannot be construed to mean she worked on jigsaw puzzles for six hours a day. Riley clearly states that for six hours a day she spends time visiting with her mother, watches television, and works on jigsaw puzzles.

Finally, the ALJ found that "In the beginning of 1995, in spite of thorough testing, Claimant's doctors had not identified any medically determinable impairment which would explain her complaints of leg pain." Tr. 18. Dr. Toner also noted "[s]he apparently has not had any specific diagnosis for any type of arthritic disorder, but it is obvious that her right knee certainly has evidence of inflammation with the effusion she has here." Tr. 226. Dr. Toner did not diagnose Riley with a specific arthritic disorder and found the same physical evidence of inflammation and effusion of her right knee that Dr. Hurley noted on June 21, 1994. Dr. Toner also noted "no obvious congestive failure." Tr. 226. Additionally, Dr. Toner noted Riley had "a fair amount of discomfort" in her cervical neck and shoulders. Tr. 225. On February 8, 1993, Dr. Gatter's examination revealed Riley was experiencing the same type of pain and assessed Riley with myofascial pain versus fibromyalgia in the areas of the neck and trunk. Nonetheless, the ALJ relied on Dr. Toner's evaluation to find Riley disabled in 1999, yet discounted the same findings of her treating physicians prior to that date. Based on the record as a whole, the Court

finds that the ALJ's finding that Riley was able to perform her past relevant work before the established disability onset date of July 14, 1999, and therefore not disabled prior to that date is not supported by substantial evidence. Accordingly, the Court finds that Riley's Motion to Reverse Partially Favorable Administrative Decision should be granted. This case should be reversed and remanded for an award of benefits to Riley as of December 18, 1994.

## RECOMMENDED DISPOSITION

The ALJ did not apply correct legal standards and his decision is not supported by substantial evidence. Riley's Motion to Reverse Partially Favorable Administrative Decision, filed January 2, 2002, should be granted.

_____
**JOE H. GALVAN**
**UNITED STATES MAGISTRATE JUDGE**

**NOTICE**

Within ten days after a party is served with a copy of these proposed findings and recommended disposition that party may, pursuant to 28 U.S.C. § 636 (b)(1), file written objections to such proposed findings and recommended disposition. A party must file any objections within the ten day period allowed if that party wants to have appellate review of the proposed findings and recommended disposition. If no objections are filed, no appellate review will be allowed.